UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | |
| | * | Criminal Action No. 18-30018-MGM |
| MATTHEW MURRAY, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER REGARDING
MOTION TO SUPPRESS
(Dkt. No. 92)

August 20, 2020

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

Matthew Murray ("Defendant") has filed a Motion to Suppress, seeking an order

suppressing the fruits of a search of his residence, 8 Southbrook Lane, Pittsfield, Massachusetts. He

asserts, among other arguments, that the affidavit in support of the search warrant intentionally or

recklessly omitted and misrepresented certain material information. Defendant therefore requests an

evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). For the following reasons,

the court concludes Defendant has made the requisite showing to obtain a *Franks* hearing.

## II. BACKGROUND

The warrant to search Defendant's residence was authorized by United States Magistrate

Judge Katherine Robertson on January 27, 2017. (Dkt. No. 93-1 at 17.) It sought permission to

search 8 Southbrook Lane, Pittsfield, Massachusetts, including all structures and vehicles on the

property, in relation to violations of 18 U.S.C. § 841 (marijuana trafficking) and 18 U.S.C. § 1956

(money laundering). (*Id.* at 17, 54.)

Attached to the application was an affidavit drafted by Massachusetts State Trooper Michael

E. Scott, a member of the DEA Task Force in the Springfield Resident Office. Scott asserted the

following in his affidavit.

On July 20, 2016, Special Agent Richard Winfield, of the Springfield FBI Field Office, "met

with an individual later identified as Jonathan M. Giedrowicz who wished to give information about

a large scale marijuana distribution ring that he was involved with." (*Id.* at 19.) Giedrowicz stated he

was a distributor of marijuana in western Massachusetts and was trying to get out of the business.

(*Id.*) The affiant reviewed Giedrowicz's criminal history, which included an open case for failing to

provide a DNA sample, a conviction of assault and battery, and charges related to larceny, false

statement on an application, identity fraud, true name violation, and possession and distribution of

narcotics, among others. (*Id.* at 20.)

On August 25, 2016, the affiant met with Giedrowicz regarding a marijuana dealer known to

him as "Matt." (*Id.*) "Giedrowicz provided a license plate and an address for 'Matt' which led to

Matt's identity, Matthew Murray." (*Id.*)

The affiant explained that "Giedrowicz has admitted that he used marijuana and sold

thousands of pounds of marijuana in the past." (*Id.*) As such, "Giedrowicz is familiar with the

handling, packaging, and characteristics of various controlled substances and . . . is considered a

member of the drug subculture." (*Id.*) Moreover, according to the affiant, Giedrowicz has proven his

reliability to the investigators by: (A) "allowing himself to be named and agreeing to testify in a court

proceeding and by providing information against his penal interest"; (B) providing the

"identification of criminal suspects," including "names, physical descriptions, addresses, family

members, and associates, places of employment, telephone numbers, etc."; and (C) providing

"detailed information on suspects criminal activity," including "methods of operation, primary territory, criminal associates, locations of criminal activity, vehicles used, license plates, etc." (*Id.*)

A.   Summary of Giedrowicz's Statements

The affidavit next explained that "Giedrowicz stated the following about" Defendant: Giedrowicz had been obtaining marijuana from Defendant for the past one and a half years (December of 2014 to August of 2016), during which time he "picked up approximately 100 loads of marijuana," with between 49 and 100 pounds in each load. (*Id.* at 20-21.) Giedrowicz originally met Defendant through a third party, but the two eventually cut out the middleman and dealt with each other directly. (*Id.* at 21.) Defendant "lives in a gated community at 8 Southbrook Road in Pittsfield" and told Giedrowicz he has a business partner, but Giedrowicz was not allowed to meet him. (*Id.*) Most of the sales between the two occurred in the Pittsfield area, either in a parking lot or one of two residences—100 Oak Hill Road, Pittsfield or 839 East New Lenox Road, Pittsfield. (*Id.*)

According to Giedrowicz, 100 Oak Hill Road is a single-family home and "[a]t the time of most of the deals at this address, the residence appeared to be unoccupied." (*Id.*) More recently, however, Defendant told Giedrowicz the house belonged to Defendant, "and at the time of this writing this residence is occupied by [Defendant's] brother, James Murray." (*Id.*) Defendant "did not store his marijuana at this residence and usually they would meet at Berkshire Crossing in the parking lot of Barnes and Nobel and [Defendant] would have Giedrowicz follow him to 100 Oak Hill Road"; Defendant "would bring the marijuana inside the residence to make the transaction." (*Id.*)

Giedrowicz reported that 839 East New Lenox Road "appears to have been used either by an associate or customer of" Defendant. (*Id.*) Defendant "would occasionally bring Giedrowicz to this address to conduct the transaction and would usually leave approximately 15 pounds of marijuana in one of the bedrooms for the resident, in addition to serving Giedrowicz." (*Id.*)

However, "[i]t did not appear to Giedrowicz that the marijuana was stored at this address"; instead, it appeared Defendant would bring the marijuana with him into the house. (*Id.* at 21-22.)

Giedrowicz also stated that "he has received approximately 15 shipments where [Defendant] transported marijuana in [his] Audi A6 and another 50 shipments" in his Toyota Tundra. (*Id.* at 22.)[1] "Giedrowicz estimates that conservatively he purchased 5000 to 6000 pounds of marijuana from" Defendant, which "equates to approximately $12,000,000 to $14,000,000 in total revenue for just one customer" between December of 2014 and August of 2014. (*Id.*) Giedrowicz, however, "is unaware where the marijuana is stored." (*Id.*)

B.   Post-October 12, 2016 Investigation

The affiant next explains that on October 12, 2016, he received a call from Giedrowicz, "who stated he received a text from [Defendant] requesting that they meet." (*Id.*) Giedrowicz agreed to meet Defendant at an outdoor coffee shop in West Stockbridge. (*Id.*) At the affiant's direction, Giedrowicz maintained "an open cellular telephone line with [the affiant]" so the conversation could be monitored. (*Id.*) At 3:30 p.m., the affiant observed Defendant leave his residence, 8 Southbrook Lane, on his Ducati Motorcycle. (*Id.*) The affiant, along with other agents, conducted visual surveillance of Giedrowicz's meeting with Defendant. (*Id.*) "For the majority of the conversation Giedrowicz's portion of the conversation was clear and audible," but Defendant's "responses were muffled and hard to understand." (*Id.* at 22-23.) Nevertheless, the affiant reports Defendant and Giedrowicz "clearly did talk about the purchase of marijuana," discussing "prices and locations" for a possible purchase of 200-250 pounds. (*Id.* at 23.) Giedrowicz told Defendant "he was sitting on some marijuana from his Boston connect that he was having trouble moving and that he couldn't push that amount." (*Id.*) Defendant stated "he was going to be re-upping from his friend in

---

[1] The affidavit later explains that "[i]nformation from Giedrowicz was specific to the make and model of the vehicles owned by" Defendant, which information was corroborated by Registry of Motor Vehicles records showing the Audi A6 was registered to Defendant. (*Id.* at 28.)

California" and "told Giedrowicz that he could trade product with a friend of his for product that came from British Columbia." (*Id.*) After a West Stockbridge police officer approached Defendant's motorcycle and spoke with Defendant, Giedrowicz and Defendant entered a store and "their conversation turned benign"—they discussed "politics and current events." (*Id.*)

After the two parted ways, the affiant and another State Trooper debriefed Giedrowicz, while other agents followed Defendant. (*Id.*) Giedrowicz reported "that after they encountered the West Stockbridge Officer they were speaking very quietly and [Defendant] was discussing the transportation of the shipment." (*Id.*) He further reported Defendant "was unsure who was going to transport the load from California to Massachusetts," but Defendant "was going to California on Sunday to make the arrangements for the shipment and to arrange for transportation." (*Id.*) The affiant "was unable to hear this portion of the conversation." (*Id.*) The other agents followed Defendant to 25 West Center Road West Stockbridge, "which has a sign for Colfax Farm," where Defendant remained "until approximately 6:00 PM at which point [the affiant] terminated surveillance." (*Id.*)

On October 14, 2016, the affiant and another task force officer met with Giedrowicz for another debriefing. (*Id.*) The affiant took six photographs of text messages on Giedrowicz's phone, all purportedly sent to Giedrowicz by Defendant, which were included in the affidavit. (*Id.* at 24.) The messages dated October 10th stated Defendant was "almost out" and "[w]on't be good again til nov," but he had 35 to 40 "hours"[2] of "work available"; they also discussed times for a meeting, which the affiant asserts were references to the meeting in West Stockbridge. (*Id.* at 24-25.) The message dated October 12th stated:

> Last ditch effort to see if we can pick a time and place tonight to meet before I go. Listen man, if I don't hear from you . . . just going to assume you have no interest in our business relationship at this point. I'm not going to keep chasing after you. So let me no or don't it's your call.

---

[2] The affidavit explained that "hours" was code for pounds of marijuana. (*Id.* at 24, 32-34, 37.)

(*Id.* at 26.)

On November 9, 2016, Giedrowicz and Defendant had another meeting at a coffee shop in West Stockbridge. (*Id.* at 27.) The conversation "was monitored over an open line by Trooper Gero," who "noted that the two spoke of 'burner phones.'" (*Id.*) Trooper Gero also reported that the two discussed price and quality of marijuana shipments. (*Id.*) After the meeting, Giedrowicz told the affiant that Defendant had provided him with a flip phone, disassembled it in front of him, and removed both the speaker and microphone so it could only be used for text messages. (*Id.*) The affiant notes that "[t]his technique is utilized by some narcotics traffickers to thwart investigative efforts of remotely activating the microphone inside a cellular device to monitor a target's conversations." (*Id.*)

On November 12, 2016, Giedrowicz and Defendant met for drinks in Northampton, Massachusetts. (*Id.*) The affiant notes that "[t]his meeting was not scheduled," so there was no "surveillance." (*Id.*) The two reportedly discussed price for an incoming load of marijuana, of which Giedrowicz "already had arrangements to reserve 250 pounds." (*Id.*) Giedrowicz, however, "doesn't know how this shipment is arriving or when exactly it is coming." (*Id.*)

On November 14, 2016, Captain Abderhaulden of the Berkshire County Drug Task Force checked Defendant's residence, 8 Southbrook Lane, and saw Defendant's Toyota Tundra in the driveway. (*Id.* at 28.) The affiant had previously checked this property on six prior occasions in the preceding several months and had only observed that vehicle in front of the residence once, but the affiant noted Defendant also has a two-car garage where he could store vehicles. (*Id.*)

On November 15 2016, the affiant obtained a warrant, issued by Berkshire Superior Court Justice John Agostini, to place GPS trackers on Defendant's 2014 Toyota Tundra and his 2012 Audi A6 for fifteen days. (*Id.*) Although both trackers were placed on the vehicles without incident, the tracker on the Audi A6 "did not appear to be able to transmit a signal and no information was ever

collected from this device," while the results from the tracker on the Toyota Tundra "produced very few investigative leads." (*Id.* at 28-29.)[3]

On December 3, 2016, Giedrowicz told the affiant he was contacted by Defendant, "who wanted to provide him with some samples (small quantity of marijuana usually nugget size piece of bud)." (*Id.* at 29.) Giedrowicz met with the affiant before his scheduled meeting with Defendant, and "Giedrowicz was instructed to keep an open cellular telephone line with" the affiant and to follow Defendant "to any secondary location in his own vehicle." (*Id.*) The affiant then observed Giedrowicz drive his vehicle next to Defendant's 2012 Audi A6 in a parking lot and then follow Defendant to 100 Oak Hill Road in Pittsfield. (*Id.* at 29-30.) Neither the affiant nor Trooper Gero observed Giedrowicz or Defendant walk inside the house. (*Id.* at 30.) While the two were inside, the affiant "was able to hear portions of their conversations," although "[t]he first couple minutes of the conversation was muffled and difficult to understand." (*Id.*) The affiant provided the following synopsis of the conversation between Giedrowicz and Defendant: They discussed a specific strain of marijuana, which Defendant said came from a local source; "haggled over price"; and discussed "the THC content of the product." (*Id.*) Giedrowicz was inside the house for eight minutes, after which the affiant and Trooper Gero observed Defendant and Giedrowicz saying goodbye in front of the residence. (*Id.* at 31.)[4]

After Giedrowicz left, he spoke with the affiant over the phone and explained that Defendant gave him seven pounds of marijuana of seven different strains, which Giedrowicz was to return if his buyers were not interested. (*Id.*) Giedrowicz then met with the affiant and gave him a

---

[3] The affiant also noted Defendant's Audi A6 "was never successfully tracked and it appears that the device was either discovered or may have fallen off. An attempt was made to retrieve the tracker and it did not appear to be in the same location where it was attached." (*Id.* at 29.) Moreover, Defendant's "use of the Toyota Tundra was sporadic during" this time. (*Id.*)

[4] Although the affidavit states that "Trooper Gero maintained surveillance on" Defendant after the two departed from 100 Oak Hill Road, it does not state the results of such surveillance, *i.e.*, the location, if any, where Defendant traveled. (*Id.*)

large cardboard box containing the marijuana. (*Id.*) According to Giedrowicz, the box of marijuana came from the trunk of Defendant's Audi A6, which Defendant carried into 100 Oak Hill Road. (*Id.*) Giedrowicz also stated that Defendant said the house was his brother's residence, and there was a male sleeping on the couch in the residence, so Defendant took Giedrowicz to the basement and asked him to be quiet when they were talking. (*Id.*) Then, according to Giedrowicz, Defendant "opened the box and handled the inside bags without gloves," he "handled the outside bags wearing gloves," and he "also brought extra heat seal bags and a black and stainless steel Cabela's brand heat sealer." (*Id.*) "Giedrowicz advised that when he was leaving he had a 'nub' from each bag and [Defendant] handed him the entire box on his way out of the residence." (*Id.*) The affiant noted that Defendant handed Giedrowicz "approximately $16,000 dollars' worth of product" and "[t]he policy of the DEA is that they cannot return any usable quantity of narcotics." (*Id.*) The affiant further noted that "[t]his was the first time that Giedrowicz had been to the 100 Oak Hill Road Residence where the residence appeared to be lived in." (*Id.*)

On December 21, 2016, Defendant sent Giedrowicz text messages (screen shots of which are included in the affidavit) requesting payment for the "past due invoice . . . before the holiday" and asking Giedrowicz not to "make this a huge deal." (*Id.* at 32.) Defendant and Giedrowicz made arrangements to meet for breakfast on December 31, 2016 so that Giedrowicz could pay the outstanding debt. (*Id.*) However, because of a snowstorm, the meeting was cancelled. (*Id.*) "Giedrowicz had previously told [Defendant] that he was going on vacation to Hawaii and would be back on January 12, 2017." (*Id.*) Sometime after the December 31 meeting was canceled, Giedrowicz sent Defendant a text message stating that when he returns from the vacation, he "will come work for 100 hours," *i.e.*, purchase another 100 pounds of marijuana, to "make it up" for being late and pay for the entire 107 pounds at one time. (*Id.* at 32-34.) Defendant, however, responded that he "would like to get the 7 situated" and they could "talk about moving forward when your [sic] back."

(*Id.* at 34.)[5] Giedrowicz also stated, in a different text message, that he had "done millions with [Defendant] and never done [him] wrong," to which Defendant responded by asking Giedrowicz when would be home from his vacation. (*Id.* at 33, 35.)[6]

On January 10, 2017, two search warrants were obtained by the IRS to search Jacob Sweener's residence in Pittsfield, Massachusetts and his brother Zachary Sweener's residence in Boston, Massachusetts, related to tax evasion and money laundering. (*Id.* at 35.) Large amounts of cash and counting machines were seized at both properties, and 41 pounds of marijuana was seized at Jacob Sweener's residence. (*Id.*) The affiant, along with Special Agent Aaron Lindamen, interviewed Zachary Sweener at his residence; "[Zachary] was advised that he was not under arrest[,] was read his Miranda rights," and "agreed to speak with investigators and signed the Miranda waiver." (*Id.*) Zachary stated: Defendant, known as "Baggs," lived near his brother and is the main supplier of the area. (*Id.* at 36.) Defendant had been "crippling both his and his brother's sales" as a competitor, "is worth millions," and "had been distributing marijuana for fifteen years." (*Id.*) Zachary claimed Defendant's "sales were so large that he owned two separate businesses over the years in order to launder the money," and his current business was Massive Graphics in Pittsfield. (*Id.*) Although Zachary and Defendant were direct competitors, they "shared similar supply lines" and Zachary "stated that he would be able to set up [Defendant's] connect in Colorado." (*Id.*) In addition, "[Zachary] claimed to be able to get into [Defendant's] Colorado supply lines as well as identify [Defendant's] business partner in exchange for keeping his vehicle and a reduced sentence."

---

[5] If Defendant had agreed on selling an additional 100 pounds, the affiant's plan was to take "the load of marijuana on a motor vehicle stop on the way to the meet location." (*Id.* at 34.)

[6] Screen shots of these text messages between Giedrowicz and Defendant were apparently sent to the affiant on January 3, 2017. (*Id.* at 34.) As noted, the affidavit includes portions of the text message conversations between the two; however, potentially relevant portions of the conversation appear to be missing from the affidavit and the exact dates of the messages are unclear. Defendant asserts Giedrowicz's "cell phone(s) were not taken into evidence and are not available for examination by the defense or the court." (Dkt. No. 93 at 13 n.10.)

(*Id.*) Zachary provided the last name "McInerney" as Defendant's partner, but "[Zachary] has

retained counsel and has provided no further information." (*Id.*)[7]

On January 12, 2017, the affiant spoke with Investigator John Mazzeo of the Pittsfield Police

Department. (*Id.*) The affiant asked Mazzeo if he knew anyone with the street name "Baggs," to

which Mazzeo responded "that 'Baggs' was a nickname used by [Defendant]." (*Id.*) The affiant next

asked Mazzeo about a male with the last name "McInerney" connected to Defendant, and "Mazzeo

stated that [Defendant] was involved in Massive Graphics with Michael McInerney and a Nicholas

Fox." (*Id.*) Mazzeo further reported that he had a conversation with McInerney "a couple months

ago," wherein McInerney stated that Defendant "was a co-owner/partner in the business but he

never sees him." (*Id.*)

On January 14, 2017, the affiant directed Giedrowicz to send Defendant a text message

explaining that he was extending his vacation until January 20, 2017. (*Id.*) Giedrowicz, in text

messages included in the affidavit, apologized to Defendant "for the wait" and offered to pay

interest; Giedrowicz also stated in the text that he "sent my guys out to Boston," which the affiant

asserts is a reference to buying the 100 pounds of marijuana elsewhere. (*Id.* at 37.) Defendant

responded that Giedrowicz put him "in a shitty spot" and stated: "why did you ask me for hours and

then go else where?" (*Id.* at 37.) The two apparently left the conversation off that they would "keep

in touch." (*Id.* at 38.)

C.    Call Records, Financial Investigation, and Travel

During the six months preceding January of 2017, Giedrowicz contacted Defendant at two

different phone numbers. (*Id.* at 39.) The affiant obtained call records for both numbers for the

month of December of 2016, which revealed that one of the numbers only communicated with

---

[7] The affiant reports that Zachary was not "given any promise that he will receive a reduced sentence" and, "[d]espite his request, [Zachary's] vehicle was seized by HIS for administrative forfeiture." (*Id.*)

Giedrowicz and the second number "primarily" communicated with Giedrowicz. (*Id.*) According to

the affiant, "[t]his is atypical for a narcotics trafficker to be that disciplined and would suggest that

[Defendant] maintains numerous telephones to communicate with each buyer of marijuana." (*Id.*)

The affidavit next explains that "[t]he DEA Asset Forfeiture Specialist ran the two

properties associated with [Defendant]," 8 Southbrook Lane and 100 Oak Hill Road, "through an

online database managed by the Warren Group." (*Id.*) Defendant purchased 100 Oak Hill Road on

March 14, 2016 for $20,000, despite an assessed value of $141,600, in what appears to be "some sort

of intra-familiar transaction." (*Id.*) There is no mortgage on this property. (*Id.*) The affiant notes that

he has "viewed this property and there is no apparent reason why this property would sell for such

an undervalued price." (*Id.* at 40.) The affiant "suspect[s] that [Defendant] may have paid additional

money outside the closing to" the seller, possibly "to avoid scrutiny of the government if $140,000

dollars were paid in cash." (*Id.*)

As to 8 Southbrook Lane, it was purchased by Defendant and his wife on August 27, 2010

for $460,000, with $368,000 mortgaged from Greylock Federal Credit Union. (*Id.*) "This indicates

that [Defendant] put down . . . $92,000 on this property, which is a down payment of approximately

20 percent." (*Id.*) This property is assessed at $644,600. (*Id.*)

The affiant next reports that the records for Defendant's 2012 Audi A6 show there is no

loan for that vehicle, while its approximately value is $9,000. (*Id.*) Defendant's 2015 Toyota Tundra

is leased through Toyota Motor Corporation. (*Id.*) Defendant's 2014 Ducati "appears to be owned

outright [by him] and has an approximate value of $18,000." (*Id.*) Defendant also "owns his 2006

Audi A6 which is worth approximately $21,000." (*Id.* at 41.) In addition, Defendant purchased a

2010 Toyota Tundra on April 10, 2010; although "[i]t is unknown what the total cost was paid for

the Toyota Tundra," Defendant "provided the dealership with $21,805 in cash towards the

purchase." (*Id.* at 40.)[8] Public records also showed Massive Graphics had annual sales of $80,432 and Defendant was listed as "Executive." (*Id.*)

The affiant also reviewed the prior ten years of travel records for Defendant. (*Id.* at 41.) Defendant traveled to Turks and Caicos Islands on March 6, 2016. (*Id.*) He also took "five trips to Canada by motor vehicle" between 2010 and 2016, which was "significant because [Defendant] told Giedrowicz that he can get marijuana from a friend in British Columbia." (*Id.*)

D.     Chicopee Break-in

On January 26, 2017, the affiant spoke with Detective Matthew Costa of the Chicopee Police Department, who asked the affiant whether Giedrowicz was a DEA informant. (*Id.*) Detective Costa informed the affiant that on January 20, 2017, Kyle Morin reported his apartment at 189 Montgomery Street, Chicopee, Massachusetts, had been broken into and watches, a video game system, and a cell phone were stolen. (*Id.*) Morin's upstairs neighbor allegedly showed Morin video surveillance footage of the break-in, and Morin identified one of the two intruders as Giedrowicz. (*Id.*) The surveillance also purportedly showed, within minutes of the break-in, a black SUV with blue plates, which matches the description of a vehicle Giedrowicz was driving when he was stopped in November of 2016, according to an internal record located by Detective Costa. (*Id.*) "Morin told Detective Costa that he received a telephone call from Giedrowicz during the time of the break-in" and he thought Giedrowicz was looking to have a fight with Morin, although Morin did not disclose the reason for the dispute. (*Id.* at 42.) Morin did not notify the police about the break-in until a day after he discovered it. (*Id.*)

The affiant reviewed his text messages with Giedrowicz and found a message from him on January 21, 2017 stating: "Also got inside to another person for 10-20 lbs p. About thirsty [sic] forty

---

[8] Although the affidavit states Defendant paid "$21,805 in cash" toward the 2010 Toyota Tundra, it then lists this same transaction in a table which states Defendant only paid $9,000 in cash at the dealership. (*Id.*) Defendant, at the time of the warrant application, no longer owned this vehicle. (*Id.*)

grand cash. Corner of Ambrose and Montgomery st. Across from that Polish guy in Chicopee.

Name Kyle Morin. 24 yrs old." (*Id.*) Giedrowicz then sent the affiant a screen shot of Morin's

contact information and stated "that the stuff is in Morin's mother's closet and room." (*Id.*)

> The affidavit next states:

> After review of all the information, it seems likely that Giedrowicz was involved with Morin's house break which makes him unsuitable to work for the DEA as an informant in the future. It is unknown what Giedrowicz's motivation was to send me the text messages about Morin. Due to the delay of Morin reporting the break-in to the police, it seems probable that Morin is selling marijuana at the residence and Giedrowicz was attempting to have the money and the product stolen from that residence. I suspect that there may have been a dispute between Giedrowicz and Morin over a drug transaction.

> It always appeared to me that Giedrowicz's motivation for providing information about [Defendant] was that he felt [Defendant] had cheated him on numerous marijuana transactions worth thousands of dollars. Giedrowicz always seemed motivated by the prospect of the forfeiture of a large amount of cash or assets resulting from the investigation of [Defendant], and Giedrowicz hoped that he could receive a portion of the proceeds if he was working as an informant on the case.

> It should be noted that Giedrowicz was contacted by Detective Costa and asked to come in for an interview. Giedrowicz told Detective Costa that he was working for someone and would have to speak to them first. As of the time of this writing Giedrowicz has not told me of the contact with Chicopee Police Department.

> I do not have any further information about the break-in. I am reluctant to speak with Giedrowicz regarding the break-in because he is no longer eligible to receive any portion of a potential seizure from the DEA and I do not know whether Giedrowicz would warn [Defendant] of a potential investigation and/or search warrant in the event Giedrowicz learns that he is no longer eligible.

> This information does impact Giedrowicz credibility, but most of Giedrowicz's information has been corroborated through monitored conversations between [Defendant] and Giedrowicz, the actual text message conversations between the two of them, and the seizure of approximately 7 pounds of marijuana. There is overwhelming evidence that [Defendant] is a large scale marijuana dealer.

(*Id.* at 42-43.)

E.    Summary of Probable Cause

> The affidavit asserts the following as a summary of its probable cause showing: Giedrowicz

stated he has received approximately 65 shipments of marijuana from Defendant, ranging from 25

to 100 pounds, for a total of 5,000 to 6,000 pounds and $12,000,000 to $14,000,000 in total revenue from one customer between December of 2014 and August of 2016. (*Id.* at 43.) "This information was independently corroborated by Zachary Sweener who confessed to being a large scale marijuana trafficker." (*Id.* at 44.) "Because of the substantial amounts of money involved, the use of credit, and the need to keep track of the terms of prior transactions during the negotiations of future transactions with customers, [Defendant] would need to retain the records from this business for substantial periods of time." (*Id.*) Moreover, in light of Defendant's use of separate cell phones for each customer, "[i]t is reasonable to believe that these telephones would be stored within his residences, on his person, or within his vehicles." (*Id.*)

The affiant next asserts that, when Defendant gave Giedrowicz the seven-pound "sample," Defendant carried a "kit," containing latex gloves and a heat sealer, into 100 Oak Hill Road for the transaction and removed the kit after the meeting. (*Id.*) "These durable goods will likely be located within [Defendant's 8 Southbrook Lane address]." (*Id.*)

On January 3, 2017, when Defendant was texting Giedrowicz and attempting to collect the $16,000 owed, Giedrowicz replied by stating he has done "Millions" with Defendant and "has never done him wrong." (*Id.*) Defendant's response "appears to accept this characterization of their prior relationship and the level of trust that exists between the two." (*Id.* at 44-45.)

The affiant and fellow investigators observed Defendant's residence, 8 Southbook Lane, approximately 50 times. (*Id.* at 45.) It "appears to be lived in and there are frequently lights on inside the residence." (*Id.*) The vehicles registered to Defendant and his wife were observed on many occasions at the address, which is used on Defendant's driver's license and vehicle registration as well as other public documents. (*Id.*) "It is unknown whether [Defendant's] wife works, however, her car has been observed at 8 Southbrook Lane on numerous occasions at varying hours." (*Id.*) Their child, estimated to be two or three years old, had also been observed there. (*Id.*)

14

The affidavit concludes its summary of probable cause by stating:

Based upon the statements made by Sweener and Giedrowicz, and a review of [Defendant's] assets and known cash flow with no known legal explanation, there is substantial evidence showing that [Defendant] is a large scale marijuana trafficker and the money earned through this criminal enterprise is utilize[d] to finance his current lifestyle.

It is impossible to tell the size of [Defendant's] criminal enterprise, however, a careful review of his text message content and call logs contained in his numerous cellular telephones and a review of his financial records contained within his residence would help identify possible distributors and/or customers. This search may shed light on where [Defendant] stores his marijuana i.e., other propert[ies] or storage units.

(*Id.*)

### III. STANDARD OF REVIEW

"Under *Franks*, 438 U.S. at 155, a defendant may request an evidentiary hearing to challenge the truthfulness of statements made by law enforcement agents in a search warrant affidavit." *United States v. Hicks*, 575 F.3d 130, 138 (1st Cir. 2009). "To obtain a *Franks* hearing, a defendant must make 'a substantial preliminary showing' that: 1) the warrant affidavit contains a false statement made 'knowingly and intentionally, or with reckless disregard for the truth,' and 2) that 'the allegedly false statement was necessary to the finding of probable cause.'" *Id.* (quoting *Franks*, 438 U.S. at 155-56) (internal citations omitted); *see also United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015) (explaining that, as to material omissions, "first, the omission must have been either intentional or reckless; and second, the omitted information, if incorporated into the affidavit, must be sufficient to vitiate probable cause."). "Recklessness may be inferred from circumstances evincing obvious reasons to doubt the veracity of the allegations." *United States v. Arias*, 848 F.3d 504, 511 (1st Cir. 2017) (quoting *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002)). Moreover, "[i]n the case of allegedly material omissions, recklessness may be inferred where the omitted information was critical to the probable cause determination." *United States v. Gifford*, 727 F.3d 92, 98-99 (1st Cir. 2013) (quoting *Burke v. Town of Walpole*, 405 F.3d 66, 81-82 (1st Cir. 2005)).

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched—the so-called 'nexus' element." *United States v. Dixon*, 787 F.3d 55, 59 (1st Cir. 2015) (quoting *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999)). As to the nexus element, the question is "whether, given all the circumstances set forth in the affidavit . . . , there exists a 'fair probability' evidence will be found in the place to be searched." *United States v. Roman*, 942 F.3d 43, 50 (1st Cir. 2019) (quoting *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 2015); *see also Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."). Moreover, the home in particular is entitled to "the highest level of Fourth Amendment protection," *Morse v. Cloutier*, 869 F.3d 16, 23 (1st Cir. 2017) (quoting *Matalon v. Hynnes*, 806 F.3d 627, 633 (1st Cir. 2015)), as "the 'very core' of the Fourth Amendment is to be 'free from unreasonable governmental intrusion' into one's home," *Roman*, 942 F.3d at 50 (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)).

## IV. ANALYSIS

Defendant asserts the affidavit here contains numerous material misrepresentations and omissions, largely related to Giedrowicz and his reliability. Defendant also contends the affidavit— even without considering the alleged misrepresentations and omissions—fails to satisfy the nexus requirement. The government, in response, argues Defendant has not made a sufficient showing to obtain a *Franks* hearing. In addition, the government argues that the affidavit demonstrates probable cause as to the nexus requirement. The court will address the *Franks* issue first, because any reformation of the affidavit as a result of a *Franks* hearing will "necessarily affect[] the four-corners analysis as to whether the affidavit established probable cause to search the residence." *United States*

*v. Roman*, 327 F. Supp. 3d 312, 323 (D. Mass. 2018), aff'd, 942 F.3d 43 (1st Cir. 2019); *United States v. Roman*, 2017 WL 4517963, at *1 n.1 (D. Mass. Oct. 10, 2017) (citing *United States v. Fleury*, 842 F.3d 774, 778 (1st Cir. 2016)).

The government is correct that some of the omissions alleged by Defendant were sufficiently disclosed in the affidavit. For example, Defendant argues Giedrowicz's revenge and financial motives were omitted from the affidavit. However, the affidavit states:

> It always appeared to me that Giedrowicz's motivation for providing information about [Defendant] was that he felt [Defendant] had cheated him on numerous marijuana transactions worth thousands of dollars. Giedrowicz always seemed motivated by the prospect of the forfeiture of a large amount of cash or assets resulting from the investigation of [Defendant], and Giedrowicz hoped that he could receive a portion of the proceeds if he was working as an informant on the case.

(Dkt. No. 93-1 at 42.) Although the affidavit certainly could have been written in a more definitive tone, and should have disclosed the circumstances surrounding Giedrowicz's initial contact with Special Agent Winfield, including the demands Giedrowicz made in exchange for his cooperation (discussed below), the court concludes Giedrowicz's revenge and financial motives, as general matters, were adequately disclosed to the reviewing judge.

Other alleged misrepresentations were, in the court's view, not particularly material in light of the other information disclosed in the affidavit. For example, Defendant argues the affidavit omitted the fact that Giedrowicz admitted to being a cocaine user. Although Defendant is correct that this information was not specifically included, the affidavit disclosed various criminal offenses, including "possession and distribution of narcotics," and stated: "Giedrowicz had admitted that he has used marijuana and sold thousands of pounds of marijuana in the past. Giedrowicz is familiar with the handling, packaging, and characteristics of various controlled substances and, as such, Giedrowicz is considered a member of the drug subculture." (Dkt. No. 93-1 at 20.) Given these other disclosures, the court does not view the failure to disclose Giedrowicz's cocaine use in particular as "necessary to the finding of probable cause," *Franks*, 438 U.S. at 156, in the sense that

"the inclusion of the omitted information would have led to a negative finding by the magistrate on probable cause," *United States v. Magee*, 834 F.3d 30, 33 (1st Cir. 2016).

The same is true as to the omission that Giedrowicz offered to wear a body recorder, in contrast to his actual use of open cellular phone lines, as disclosed in the affidavit. Contrary to Defendant's argument, including the offer to wear a body recorder would not have materially altered the probable cause calculus. Similarly, Defendant argues the affidavit omitted that Giedrowicz signed a Confidential Source Agreement, in which he agreed to refrain from engaging in unlawful conduct, on January 18, 2018, the day before he was allegedly involved in the Chicopee break-in, (Dkt. No. 93-1 at 89-92), whereas the affidavit merely states Giedrowicz never told the affiant about his "contact with the Chicopee Police Department." (*Id.* at 42.) Again, however, given the affidavit's disclosure of Giedrowicz's probable role in the Chicopee break-in, the court does not consider the omission of the alleged violation of the Confidential Source Agreement, on its own, as materially impacting the probable cause showing.

In addition, Defendant argues the affidavit's assertion that Giedrowicz provided information "against his penal interest" is false. (Dkt. No. 93-1 at 20.) Defendant, however, does not develop this argument, and the court fails to see how the affidavit's assertion in this regard is inaccurate or materially misleading.

On the other hand, Defendant has made substantial preliminary showings as to other misrepresentations and omissions. Defendant argues the affidavit falsely states that Giedrowicz provided Defendant's residential address, 8 Southbrook Road, and omitted the fact that Giedrowicz actually provided false information as to where Defendant lived. The affidavit states: "Giedrowicz provided a license plate and an address for 'Matt' which led to Matt's identity, Matthew Murray." (Dkt. No. 93-1 at 20.) In addition, the following paragraph declares that "Giedrowicz stated the following about Matthew Murray: . . . Murray lives in a gated community at 8 Southbrook Road in

Pittsfield." (*Id.* at 21.) The clear impression these two statements leave on the reader is that Giedrowicz provided investigators with Defendant's 8 Southbrook Road address. As Defendant points out, however, Special Agent Winfield's July 21, 2016 report indicates Giedrowicz inaccurately stated that Defendant lived in West Stockbridge, Lee, and/or Great Barrington. (Dkt. No. 93-1 at 2, 4.) That Giedrowicz did not provide investigators with Defendant's address, did not know the address, and, it appears, instead provided false information as to where he lived is highly material to both Giedrowicz's reliability as an informant and the nexus (or lack thereof) to Defendant's home.

Similarly, the affidavit asserts Giedrowicz had proven his reliability by providing "[t]he identification of criminal suspects, including: names, physical descriptions, addresses, *family members* and associates, *places of employment*, telephone numbers, etc." (*Id.* at 20 (emphasis added).) But Defendant asserts, and the government does not dispute, that Giedrowicz did not provide any information about Defendant's businesses; rather, it was Zachary Sweener who provided information regarding Massive Graphics.[9] According to Defendant, Giedrowicz also failed to provide any information about Elizaveta Murray (Defendant's wife) or her employment. Moreover, whereas the affidavit states "[i]t is unknown whether [Defendant's] wife works," (*id.* 45) in actuality she earned a six-figure income annually in the years 2012 to 2018. (*Id.* at 73.) Importantly, as Defendant argues, the affidavit's "representation that [Giedrowicz] provided information about [Defendant's] family and employment" is naturally construed as "suggest[ing] that there was no relevant information on these subjects," thereby strengthening the suspicion of Defendant's "lifestyle" being financed by drug-related activities. The court finds, in light of the other significant weaknesses regarding Giedrowicz's reliability and the government's probable cause showing, that

---

[9] Furthermore, neither Giedrowicz nor the affidavit disclosed the fact that Defendant sold a separate business, The Garden, in 2015 for $50,000, (Dkt. No. 93-1 at 75), a fact relevant to the affidavit's discussion regarding Defendant's finances and the lack of "legal explanation" for his ability to fund "his current lifestyle."

Defendant is entitled to explore at a *Franks* hearing whether the affiant recklessly misrepresented or omitted information regarding Defendant's and his wife's income or places of employment. *See United States v. Tanguay*, 787 F.3d 44, 53 (1st Cir. 2015) (holding that "the district court erred in ruling as a matter of law that an affiant never has a duty to make further inquiry before presenting a warrant application to a magistrate.").

Defendant also takes issue with the affidavit's statement that Giedrowicz "is unaware where the marijuana is stored," (Dkt. No. 93-1 at 22) and asserts the affidavit omitted that Giedrowicz claimed Defendant stored his marijuana at 100 Oak Hill Road.[10] The failure to disclose Gierowicz's statement that Defendant stored marijuana at a separate address, (*id.* at 4)—even if subsequent information changed this belief, as the government argues—was, again, highly material to Giedrowicz's reliability and the nexus showing as to 8 Southbrook Road. Had the affidavit included this omission, the weak connection between Defendant's suspected criminal activity and his home, discussed more below, would have been further undermined.

Defendant raises various additional omissions related to Giedrowicz's work as an informant. For example, Defendant asserts that Giedrowicz, contrary to the impression created by the affidavit, was not an authorized DEA source at any time during his active participation in the investigation. Rather, Giedrowicz was only activated as a DEA confidential source on March 7, 2017, and on March 13, 2017, the affiant filed a Request for Payment under 28 U.S.C. § 524(c), requesting that Giedrowicz be rewarded 5% of the forfeited property seized from Defendant. (Dkt. No. 93-1 at 92-94.)[11] The timing of these events raises significant questions, given that the affidavit represented Giedrowicz was "unsuitable to work for the DEA as an informant in the future" and was "no longer

---

[10] This omission is also inconsistent with the affidavit's statement that Defendant "did not store his marijuana at [100 Oak Hill Road]." (Dkt. No. 93-1 at 21.)

[11] The government asserts this request was withdrawn on August 27, 2018. (*See* Dkt. No. 93-1 at 95, Ex. H.)

eligible to receive any portion of a potential seizure from the DEA," following the January of 2017 Chicopee break-in. (Dkt. No. 93-1 at 42-43.) The court concludes Defendant has made a sufficient preliminary showing to explore these issues at a *Franks* hearing, again in light of the weak nexus and reliability showings as well as the other alleged misrepresentations and omissions.

Similarly omitted from the affidavit are the strange circumstances of Giedrowicz's initial encounter with Special Agent Winfield and Giedrowicz's initial conditions demanded for his cooperation. As detailed in Special Agent Winfield's July 21, 2016 report, Giedrowicz unexpectedly arrived at Winfield's home on July 18, 2016 and rang his doorbell. (Dkt. No. 93-1 at 1.) When Winfield opened the door, Giedrowicz "advised that he knew SA Winfield's oldest son" and "was looking for some assistance." (*Id.*) Giedrowicz also reportedly told Winfield that he "came to me [Winfield] because my oldest son spoke highly of my reputation to do the right thing years ago, when they (my boy and [Giedrowicz]) were in school together." (*Id.* at 9.) In addition, Giedrowicz told Winfield "that for his . . . cooperation, [Giedrowicz] wanted witness protection, a portion of any reward for assets forfeited to the United States Government, that he . . . does not get jammed up for cooperating with law enforcement and that he . . . wants his . . . life back." (*Id.* at 2.) The affidavit, however, makes no mention of Giedrowicz's initial conditions for his cooperation. Moreover, the affidavit merely states, as to the commencement of the investigation, that Special Agent Winfield met with Giedrowicz on July 20, 2016, without disclosing how their meeting came about. Including the circumstances of Special Agent Winfield's initial meeting with Giedrowicz in the affidavit would have, in the court's view, further weakened his reliability as an informant.

Giedrowicz's reliability was particularly important because of the significant red flags which were disclosed in the affidavit, namely, the events surrounding the Chicopee break-in and his

criminal history.[12] Moreover, the affidavit indicates that at critical points in the investigation, the government was forced to rely, in large part, on Giedrowicz's reports of his interactions with Defendant. *See Roman*, 942 F.3d at 53 (discussing lack of corroboration of informant's statements). For example, during the December 3, 2016 meeting between Giedrowicz and Defendant, during which Defendant allegedly provided the seven-pound marijuana "samples," no investigator observed, despite surveillance, the two enter 100 Oak Hill Road (when the contraband would have been carried into the house). (Dkt. No. 93-1 at 30-31). And the affidavit reports no observation, upon their exit, of either the cardboard box containing the marijuana or the "kit" Defendant used. Accordingly, as was true in those instances where conversations were partially muffled, the government had to rely on Giedrowicz's accounts. In addition, the government has no recordings of the monitored conversation and, apparently, does not have Giedrowicz's cell phone itself but, instead, only potentially selective screen shots of certain text messages. These circumstances highlight the significance of Giedrowicz's reliability.

Granted, the court acknowledges that many of these misrepresentations and omissions are not especially material to the nexus element. But the fact is that the affidavit as submitted—without considering the alleged misrepresentations or omissions—did not make a strong nexus showing to begin with.[13] Rather, as was true in *Roman*, there is simply a scarcity of information connecting drug activity to Defendant's home. *See Roman*, 942 F.3d at 52 (explaining that the affidavit "contains no

---

[12] Defendant argues that because Giedrowicz's criminal history included acts of violence and offenses involving dishonesty or false statement, he was considered a "Restricted Use" confidential source, requiring greater supervision. (Dkt. No. 93 at 13.)

[13] The court emphasizes that at this stage—in deciding whether Defendant has met his burden to obtain a *Franks* hearing—it need not, and does not, decide whether the affidavit as submitted established probable cause. Instead, the court is only deciding whether Defendant has made a substantial preliminary showing that the affidavit contains reckless misrepresentations or omissions and that, when the affidavit is reformed to correct the misrepresentations and include the omissions, probable cause would be lacking at that point. The court merely highlights the weak nexus showing of the original affidavit as relevant to the second question—whether the affidavit as reformed lacks probable cause. In the event Defendant does not demonstrate at least recklessness at the *Franks* hearing, then the court will conduct a four-corners analysis of the affidavit as submitted.

specific facts or observations connecting [Defendant's] alleged drug activity to his home"). It is true that "[a] 'nexus . . . need not, and often will not, rest on direct observation, but rather can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of crime].'" *Id.* at 51 (quoting *Feliz*, 182 F.3d at 88. "But [the First Circuit has] not permitted this inference to be applied lightly." *Id.* Instead, the First Circuit has "made clear" it does "'not suggest that, in all criminal cases, there will automatically be probable cause to search a suspect's residence,'" and has "rejected a per se rule automatically permitting the search of a defendant's home when he has engaged in drug activity." *Id.* (quoting *Feliz*, 182 F.3d at 88). In addition, the First Circuit has "further 'expressed skepticism that probable cause can be established by the combination of the fact that a defendant sells drugs and general information from police officers that drug dealers tend to store evidence in their homes.'" *Id.* at 51-52 (quoting *United States v. Bain*, 674 F.3d 1, 23-24 (1st Cir. 2017)). Thus, the First Circuit has explained, "generalized observations of this type should be combined with specific observations, or facts connecting the drug dealing to the home to permit an inference of nexus to a defendant's residence," such as "evidence that drug distribution was being organized from [the defendant's] residence, . . . that the defendant used his home as a communication hub for drug activity, . . . or that the defendant move[d] back and forth from his residence in relation to drug transactions." *Id.* at 52 (internal quotation marks omitted).

The closest the affidavit comes to providing any such specific observations connecting criminal activity to the home is the report that Defendant on October 12, 2016, drove his Ducati motorcycle from his home to meet Giedrowicz at a coffee shop to discuss the sale of marijuana. But, as the government itself acknowledges, traveling from the home to a meeting where criminal activity was merely discussed is not the same, from a nexus standpoint, as leaving the home directly before engaging in criminal activity, in which case it may be inferred that evidence (*e.g.*, drugs) is kept

in the home. To be sure, Defendant's vehicles were allegedly used in his transactions with

Giedrowicz, and those vehicles are tied to 8 Southbrook Lane. But the affidavit does not suggest

evidence was stored (rather than transported) in the vehicles nor does it indicate that Defendant

traveled directly from his home to the drug transactions. Moreover, Giedrowicz never stated

Defendant kept his marijuana at his home but, instead, claimed at one point that Defendant stored

the marijuana at 100 Oak Hill Road.

The government argues that, at the very least, probable cause existed as to cell phones and

financial records and, furthermore, the plain view doctrine applies to the marijuana and other

evidence seized. According to the government, "[i]f the agents had simply obtained a search warrant

for the cell phones, electronic devices, cash, documentary evidence and the like, hoping to find

marijuana in the house, and then did find marijuana in plain view, seizure of the marijuana would be

valid." (Dkt. No. 107 at 25.) While the court appreciates the transparency of the government's

argument, and agrees that, within the appropriate context, it reflects an accurate assessment of the

law, *see Horton v. California,* 496 U.S. 128, 138-39 (1990); *Ribeiro,* 397 F.3d at 51-53, it feels compelled

to highlight how potentially abusive this government approach could be to the Fourth Amendment

protections. The government's argument risks normalizing routine searches of a suspect's home

simply because a ubiquitous cell phone—a small device which has the capacity to store vast amounts

of intimate information—could be located anywhere in a suspect's home, thereby giving law

enforcement virtually free-range to look around and apply the plain view doctrine to everything else

they see. *See Riley v. California,* 573 U.S. 373, 396–97 (2014) ("[A] cell phone search would typically

expose to the government far more than the most exhaustive search of a house: A phone not only

contains in digital form many sensitive records previously found in the home; it also contains a

broad array of private information never found in a home in any form—unless the phone is.");

*United States v. Schultz,* 14 F.3d 1093, 1097–98 (6th Cir. 1994) ("Officer Ideker did not have anything

more than a guess that contraband or evidence of a crime would be found in the boxes, and therefore the first warrant should not have been issued. To find otherwise would be to invite general warrants authorizing searches of *any* property owned, rented, or otherwise used by a criminal suspect—just the type of broad warrant the Fourth Amendment was designed to foreclose."); *see also United States v. Ribeiro*, 397 F.3d 43, 50 (1st Cir. 2005) (citing *Shultz* for the proposition that "an officer's training and experience 'cannot substitute for the lack of evidentiary nexus'").

Here, moreover, the government's plain-view argument overlooks the weak connection between Defendant's home and the cell phones and documentary evidence. As to the cell phones, the affidavit provides no specific link between the phones used in criminal activity and 8 Southbrook Lane. The affidavit does not provide facts indicating Defendant kept these cell phones at his residence or even communicated from there. In addition, the affidavit provides no indication these specific phones were used for personal, in addition to drug-related, purposes, such that it might be reasonable to infer Defendant kept the phones with him at the residence. Rather, the affidavit makes clear that the phones used to communicate with Giedrowicz were "burner" phones, making them less likely to be kept at the residence. In fact, the affidavit states Defendant removed parts from one of these cell phones in Giedrowicz's presence in order to avoid being monitored, indicating a level of cautiousness in relation to these phones which strongly cuts against the idea that Defendant would keep them in his home. The government's argument that Defendant "logica[lly]" would keep these cell phones at home, (Dkt. No. 107 at 19), is "speculative and without factual basis." *Roman*, 942 F.3d at 53 n.7.

The government's argument that financial records would be found at Defendant's home is similarly speculative. Unlike the affidavit in *Feliz*, the affidavit here did identify other residences (and a business) which Defendant could have used—and, in the cases of 100 Oak Hill Road, Pittsfield and 839 East New Lenox Road, Pittsfield, did use—in conducting drug transactions. *Compare Feliz*,

182 F.3d at 88.[14] Moreover, although the affidavit here does state Defendant sold marijuana to Giedrowicz for approximately two years, and Zachary Sweener claimed Defendant had been distributing marijuana for fifteen years, those allegations are simply not the same, in terms of quality or reliability, as the "substantial, detailed information [contained in the *Feliz* affidavit] indicating that Feliz had engaged in illegal drug trafficking for at least twelve years." *Feliz* 182 F.3d at 87; *see also Roman*, 942 F.3d at 52 (explaining that the affidavit in *Feliz* "included information from two reliable confidential informants who averred that the defendant trafficked drugs, including direct testimony from one informant that the defendant was a 'long-time, successful, drug trafficker' from whom the informant had purchased drugs on several prior occasions, dating back approximately twelve years," thereby "supporting the conclusion that 'Feliz's drug trafficking was of a continuous and ongoing nature.'" (quoing *Feliz*, 182 F.3d at 87)).

Accordingly, in light of the affidavit's weak showing connecting criminal activity to the home, when the material omissions and misrepresentations are added to mix—which further undermine Giedrowicz's already suspect reliability and further weaken the nexus showing—the court concludes probable cause would be lacking. The court also concludes, in light of the number of alleged material omissions and misrepresentations and their importance to the probable cause determination, that Defendant has raised a sufficient inference of recklessness. *See Arias*, 848 F.3d at 511; *Gifford*, 727 F.3d at 98-99.

Defendant still faces a difficult task. He must prove that the misrepresentations or omissions—assuming they occurred—were done either intentionally or with reckless disregard for the truth. If he succeeds in that showing, however, the usual deference accorded the issuing

---

[14] In addition, as the First Circuit pointed out in *Roman*, "the *Feliz* affidavit did not contain any recklessly made material misrepresentations or present any questions of credibility as to the affiant." *Roman*, 942 F.3d at 52. "Accordingly," unlike in *Roman*, where reckless omissions and misrepresentations were found, "the *Feliz* court afforded 'considerable deference' the magistrate judge's probable cause determination." *Id.* (quoting *Feliz*, 182 F.3d at 86). Here, similar to *Roman*, the court is presented with potentially reckless or intentional omissions and misrepresentations.

magistrate judge's decision to approve the warrant would not apply,[15] and the court is prepared to say—at this preliminary stage—that probable cause would be absent for insufficient connection to the house. *See Roman*, 942 F.3d at 50 ("[W]hile reviewing courts generally afford substantial deference to a magistrate's determination of probable cause, where '[a]llegations of intentional or reckless misstatements or omissions' are proven true, we owe 'no deference to a magistrate's decision' because this "'implicate[s] the very truthfulness, not just the sufficiency, of a warrant application.'" (quoting *Burke v. Town of Walpole*, 405 F.3d 66, 82 (1st Cir. 2005)). Defendant, the court finds, is entitled to attempt to make that showing at a *Franks* hearing.

## V. CONCLUSION

For the foregoing reasons, the court ORDERS that a *Franks* hearing be held consistent with this decision. The court will hold a telephonic status conference on September 3, 2020, at 12:00 p.m. to discuss scheduling the *Franks* hearing.

  /s/ Mark G. Mastroianni  
MARK G. MASTROIANNI  
United States District Judge

---

[15] In addition, if Defendant satisfies his burden at the *Franks* hearing, the good-faith exception likely would not apply either. *See Roman*, 327 F. Supp. 3d at 327-28.